FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2012 FEB 23 AM 8: 37

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

UNITED STATES OF AMERICA )
                          )
        v.                )        CR 111-361
                          )
MARION STURGIS DONALDSON  )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

In the above-captioned criminal case, the government has charged Defendant Marion

Sturgis Donaldson with one count of conspiracy to distribute and possess with intent to

distribute five or more kilograms of cocaine hydrochloride, 28 or more grams of cocaine

base, and an amount of marijuana, in violation of 21 U.S.C. § 841(a), as well as two counts

of using a communication facility in causing or facilitating the commission of a felony, in

violation of 21 U.S.C. § 846. (Doc. no. 1.) The matter is presently before the Court because

Donaldson has filed a motion to suppress all evidence obtained as a result of the searches of

his automobile and residence, both of which occurred on July 1, 2011. (Doc. no. 90.) The

government opposes this motion. (Doc. no. 101.) The parties have attached various

evidentiary exhibits to their briefs (doc. no. 90, Exs. A-E; doc. no. 101 ), and on January 30,

2012, an evidentiary hearing was held, during which the Court heard testimony from Ty

Hester, an Investigator with the Richmond County Sheriff's Office; Jason Johnson, a Trooper

with the Georgia State Patrol; Lisa Reynolds, a Deputy with the Morgan County Sheriff's Office; Philip Turner, a Detective with the North Augusta Department of Public Safety; the Honorable Roger Edmonds, former Chief Magistrate Judge in Aiken County, South Carolina; and the Honorable Sheridan L. Lynn, Jr., Magistrate Judge in Aiken County, South Carolina. For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Donaldson's motion to suppress be **DENIED**.

## I.     FACTS

In March of 2011, officers with the Narcotics Division of the Richmond County Sheriff's Office, including Investigator Hester, commenced an investigation of Dorsett Mandrell Williams, Donaldson's Co-Defendant in this case, based on their suspicion that he was involved in dealing narcotics. (Doc. no. 101, p. 1 & Ex. B; FTR 10:40:44-41:48.[1]) In particular, a confidential informant provided information that Williams was selling large amounts of cocaine; the informant also told the officers that Williams' cocaine operation involved the use of two houses located across the street from each other on Camille Street in Augusta, Georgia. (FTR 10:41:00-41:48.) Williams used one of the houses as a "trap house," which Investigator Hester explained is a common slang term referring to a premises used to conduct narcotics transactions; the other house was used as a "stash house," which Investigator Hester explained is a similarly common term referring to a premises used to store money and narcotics. (FTR 10:41:48-42:08.) The officers conducted surveillance and

---

[1]Although a transcript of the January 30, 2012 hearing has not been prepared, the Court was able to review the proceedings on the Court's recording system, For the Record ("FTR").

determined that Williams did not live in either house; rather, the houses were used exclusively for their respective purposes in his drug dealing operation. (FTR 10:42:30-43:25; 11:23:06-23:27.) The officers additionally arranged a number of controlled purchases of cocaine, the majority of which were carried out at the Camille Street houses. (FTR 10:43:25-44:50.)

Based on the information obtained during the initial portion of their investigation, the investigating officers with the Richmond County Sheriff's Office, including Investigator Hester, requested and obtained authorization from a Richmond County Superior Court judge to intercept calls on several telephones belonging to Williams; the first such authorization was obtained on May 24, 2011. (Doc. no. 101, p. 1; FTR 10:44:50-46:58, 47:30-47:45.) The officers intercepted a number of calls between Williams and an individual later identified as Donaldson. (FTR 10:46:58-47:18.)

During these calls, Williams and Donaldson engaged in discussions that the officers determined to be related to drug transactions. For example, in one call, Williams told Donaldson that he had "29 cent" for him; Investigator Hester testified that, based on his experience as a narcotics officer, he understood this to mean that Williams had $29,000.00 with which to purchase drugs. (FTR 10:48:27-50:00.) During the same call, Williams told Donaldson that he would be "up top" and that the "29 cent" would be in the trunk of the Monte Carlo. Based on their observations of Williams' drug operation, the officers ascertained that this terminology referred to an arrangement for Donaldson to go to one of Williams' houses that he referred to as "up top," to pick up $29,000.00 from the trunk of Williams' automobile – a Chevrolet Monte Carlo – and to leave cocaine in its place. (FTR

3

10:50:00-50:48.) Following the call, officers verified that the Monte Carlo was parked in the location indicated. (FTR 10:50:49-51:00.)

In another call intercepted on June 10, 2011, Williams asked Donaldson if he was still "holding up," to which Donaldson replied that he was; Williams then again said that he would be "up top," and he told Donaldson that he wanted "the half." (FTR 10:51:14-51:48.) Investigator Hester decoded this conversation, explaining that Williams asked Donaldson if he had any cocaine, Donaldson said he did, and Williams indicated for Donaldson to deliver half a kilogram of cocaine. (FTR 10:51:48-52:16.) The officers then observed an individual in a vehicle registered to Donaldson arrive at Williams' house referred to as "up top" and leave after a few minutes. (FTR 10:52:16-52:38.) On June 16, 2011, officers intercepted another call, in which Williams and Donaldson discussed the June 8, 2011 drug-related arrest of Timothy Gracy, another Co-Defendant in this case, as well as the fact that their cocaine business had been slow of late. (FTR 10:53:00-55:05.)

By this point, Investigator Hester and the other investigating officers had determined that Donaldson was Williams' drug supplier, and on June 26, 2011, they obtained authorization from a Richmond County Superior Court judge to intercept calls on Donaldson's cellular telephone, as well as authority to "ping" the phone to determine its location. (Doc. no. 101, p. 2; FTR 10:47:18-47:30, 55:39-56:20.) Investigator Hester and another officer also observed a transaction between Donaldson and Williams on June 26th. Specifically, they observed Donaldson pull up near Williams' houses on Camille Street; Williams entered the "stash house" and came out carrying a white bag, which he handed to Donaldson. (FTR 10:56:30-57:49.) The transaction lasted only a few minutes, and

4

Donaldson drove away without ever exiting his car. (FTR 10:57:49-58:01.) Following the meeting, the officers "pinged" Donaldson's phone and determined its location to be 180 Oakland Drive, North Augusta, South Carolina. (Doc. no. 101, p. 2.) Officers confirmed that this was Donaldson's residence by observing him there and by verifying that a vehicle at the house was registered to Donaldson; in addition, officers were again able to locate Donaldson's cell phone at the residence via "ping" tracking on June 27 and 28, 2011. (FTR 11:03:17-04:03; doc. no. 101, p. 3 & Ex. A.)

On June 27, 2011, officers intercepted a call on Donaldson's phone in which he talked with an individual identified only as "Big." (FTR 10:58:01-58:21.) Donaldson and Big discussed an upcoming drug transaction, and Donaldson said at one point that he "might be alright" until the weekend, meaning that he had enough cocaine for the time being; they also referred to "counts" during the call, and Big asked Donaldson "what he wanted," to which Donaldson responded "a set of tires." (FTR 10:58:21-59:13.) Based on his training, experience, and knowledge of the investigation, Investigator Hester stated that he knew that "counts" referred to money and "tires" referred to kilograms of cocaine, with a "set" representing four kilograms. (Doc. no. 101, p. 3; FTR 10:59:05-59:20.) Officers intercepted additional calls and surveilled Donaldson during the next two days; one call made reference to a "nine ounce deal," and he engaged in two brief transactions that Investigator Hester characterized as indicative of drug-related activity. (FTR 10:59:20-11:00:54.)

On June 28, 2011, one of the Richmond County officers involved in the investigation contacted Detective Philip Turner of the North Augusta Department of Public Safety for assistance in obtaining a warrant to search Donaldson's residence at 180 Oakland Drive.

(FTR 11:09:27-10:06, 11:46:44-47:49.) Detective Turner was provided with a written summary of the findings of the investigation, which he went over with the Richmond County officer who provided it to him. (FTR 11:10:06-10:27, 11:47:49-48:39; Gov't Ex. 2.) The written summary of the investigation discusses the previously mentioned intercepted calls and surveillance; it specifically refers to the June 27th phone call, as well as Williams' "trap house" on Camille Street and the June 26th exchange between Williams and Donaldson at the Camille Street location. (See Gov't Ex. 2.) The summary also discusses the officers' information that Donaldson resided at 180 Oakland Drive in North Augusta, including their tracking of his cell phone, observation of him at the residence, and verification that a vehicle at the residence was registered in his name. (See id.)

Based on this information, Detective Turner drafted a search warrant and accompanying affidavit. (FTR 10:50:45-11:50:54; Gov't Ex. 1.) The affidavit states, in pertinent part:

> I, Phillip M. Turner, being duly sworn, depose and say: I am a police officer, certified in South Carolina. The North Augusta Department of Public Safety has employed me for over 9 years, the last 5 years as a Narcotics Detective. I have investigated hundreds of cases involving controlled substances . . . . I have attended over one hundred hours of specialized training in the field of Narcotics detection, identification, concealment, searches, seizures, and undercover operations. I have been certified as an expert in the field of Narcotics Investigation in the second judicial circuit of South Carolina. . . .
>
> . . .
>
> Through the use of multiple investigative means and techniques it has been established that within the past seventy-two hours, Donaldson was in possession of a quantity of Cocaine and was in the process of acquiring more Cocaine.
>
> Through further investigative techniques it has been discovered that

Donaldson is living at 180 Oakland Drive, North Augusta, South Carolina. Reviewing the City of North Augusta Water files it has been discovered that the account is in Donaldson's name. Upon conducting physical surveillance at the residence, a [vehicle] is parked at the residence and does come back [as registered] to Donaldson.

Through using proven investigative tools and measures, it has been established that Donaldson has been present for extended periods of time at the residence in question.

Upon my training and experience, I believe that probable cause exists that Cocaine and items associated with the distribution or ingestion of Cocaine are present on the property of 180 Oakland Drive, North Augusta, South Carolina.

(Gov't Ex. 1.)

Later the same day, Detective Turner met with the Honorable Roger Edmonds, then-Chief Magistrate Judge of Aiken County, South Carolina, to apply for a search warrant. (FTR 11:51:08-51:54.) Detective Turner testified that he went over the warrant and accompanying affidavit with Judge Edmonds. Detective Turner further testified that he provided sworn, oral testimony to Judge Edmonds in which he explained the entire content of the written summary that he had been provided by the Richmond County officers. (FTR 11:51:54-12:00:00; Gov't Ex. 2.) Detective Turner stated that his oral testimony was not recorded, which is not unusual in the South Carolina warrant application process.[2] (FTR

_____

[2]Detective Turner explained that the practice of providing sworn, oral testimony in applying for a warrant rather than including all information in an affidavit attached to the warrant owes to the fact that, when serving a warrant in South Carolina, officers must leave a copy of the warrant and any written attachments. Thus, any ongoing investigative techniques, such as wiretaps or other covert surveillance, would be compromised if their existence were divulged in the written affidavit. (FTR 12:01:41-02:30.) For the same reason, in drafting the affidavit to be attached to the warrant in this case, Detective Turner stated that he used language such as "investigative techniques" rather than specifically

12:01:02-01:41.) Judge Edmonds signed the search warrant on the same date it was presented – June 28, 2011. (Gov't Ex. 1.)

In his testimony, Judge Edmonds confirmed that his standard procedure for reviewing search warrant applications involved written as well as oral testimony, often unrecorded, from the officer applying for the warrant. (FTR 1:24:18-25:18.) Judge Edmonds recognized the June 28th warrant to search Donaldson's residence, which he had reviewed upon being subpoenaed to appear at the hearing. (FTR 1:25:18-25:55.) Judge Edmonds testified that he did not specifically recall whether Detective Turner provided oral testimony or any additional documentary support in applying for the warrant, although he believed Detective Turner had provided oral testimony. (FTR 1:25:18-30:52.) Moreover, upon reviewing the written summary (Gov't Ex. 1), Judge Edmonds testified that he recalled its factual content; he concluded that, at the time Detective Turner applied for the warrant, he must have either reviewed the written summary or heard Detective Turner's oral testimony as to the facts set forth in the summary. (FTR 1:30:42-31:25, 1:34:45-35:24.)

The Court additionally heard testimony from the Honorable Sheridan L. Lynn, Jr., who also serves as a Magistrate Judge in Aiken County, South Carolina. (FTR 1:39:00-39:20.) Judge Lynn testified as to a phone conversation he had with Judge Edmonds on January 6, 2012, pertaining to the warrant at issue in this case. In particular, Judge Lynn testified that Judge Edmonds stated during that conversation that "he had nothing else other than what was on the affidavit." (FTR 1:39:20-39:41.) When asked whether Judge Edmonds

---

describing the steps taken during the investigation. (FTR 11:53:00-53:27.)

had indicated during the conversation whether oral testimony was taken, Judge Lynn stated, "No. When I called [Judge Edmonds] on the telephone . . . he said, 'No, I don't have anything else to tell you.'" (FTR 1:39:41-40:01.)

Judge Edmonds testified that he recalled the January 6th conversation with Judge Lynn. (FTR 1:36:56-37:08.) According to Judge Edmonds, he told Judge Lynn that, aside from the affidavit, he had no additional documentation that was attached to the warrant. Judge Edmonds testified that he also told Judge Lynn that he did not remember other specific details regarding the affidavit, and he denied having told Judge Lynn that he did not take oral testimony before signing the warrant. (FTR 1:36:56-37:44.)

On June 29 and 30, 2011, officers intercepted additional calls between Donaldson and Big in which they continued to discuss an upcoming drug deal; eventually, Donaldson told Big that he would meet him the morning of July 1, 2011. (FTR 11:00:54-02:24.) Big called Donaldson again around 9:14 a.m. on July 1st. During that call, they confirmed that they were going ahead with the deal, and Big asked if they were still on the same "channel," to which Donaldson responded that he needed to go "down one channel." (FTR 11:02:30-03:03.) Investigator Hester interpreted this to mean that instead of buying four kilograms of cocaine, as initially planned, he would instead purchase three kilograms. (FTR 11:03:03-03:17.) In another call later that morning, Big said he would be at the "warehouse," and Donaldson said that he was on the way. (FTR 11:04:05-04:32.)

Investigator Hester and other officers followed Donaldson, as they did not know the location of "the warehouse." After pursuing Donaldson westbound on Interstate 20 for a significant distance, they determined that he was likely headed into Atlanta. (FTR

9

11:04:32-04:59.) Because they did not want to risk losing track of Donaldson's vehicle in heavy traffic, the officers decided to stop Donaldson before he reached Atlanta. As the Richmond County officers were in civilian clothing and unmarked vehicles, they contacted officers with the Georgia State Patrol and requested assistance in making the stop. (FTR 11:04:59-06:00.) Jason Johnson, a Trooper with the Georgia State Patrol, testified that he received the call for assistance from Investigator Hester, who informed him that Donaldson's vehicle was likely to contain a large amount of money for a drug transaction. (FTR 11:28:40-30:11.) The Richmond County officers also requested that a canine unit be present on the scene. Because the nearest canine unit with the Georgia State Patrol was over an hour away, Deputy Lisa Reynolds with the Morgan County Sheriff's Department was contacted to assist with the stop. (FTR 11:38:50-39:30.)

Trooper Johnson, along with another uniformed officer from the Georgia State Patrol, stopped Donaldson's vehicle on Interstate 20 before it reached Atlanta. (FTR 11:30:42-32:40.) Investigator Hester and the other Richmond County officers, as well as Deputy Reynolds, arrived almost immediately at the scene of the stop. (FTR 11:40:05-40:32.) Trooper Johnson approached the vehicle, asked Donaldson for his license and proof of insurance, and directed him to exit the vehicle. (FTR 11:33:32-34:03.) After Donaldson stepped out of his vehicle, Investigator Hester asked Deputy Reynolds to have her canine perform an open air "sniff" around the vehicle. (FTR 11:40:32-40:38.) Deputy Reynolds walked her canine around the outside of the vehicle, and the canine signaled that she detected the odor of narcotics coming from the vehicle. (FTR 11:40:38-41:05.) Deputy Reynolds

10

informed the Richmond County officers of the positive alert for an odor of narcotics.[3] (FTR 11:42:16-42:38.)

At that point, Investigator Hester and another Richmond County officer searched Donaldson's vehicle. Within a matter seconds, they found a bag containing $82,025.00 in cash under the back seat of the vehicle.[4] (FTR 11:07:06-07:39.) After finding the money, Donaldson was taken to a nearby rest stop, where he was interviewed by agents with the Richmond County District Attorney Task Force. During that interview, Donaldson stated that had been traveling to Atlanta to purchase three kilograms of cocaine with the money found in his vehicle. (FTR 11:07:39-09:07.)

Around the same time as the traffic stop, officers in North Augusta executed the search warrant on Donaldson's residence at 180 Oakland Drive. (Doc. no. 101, p. 4; FTR 11:09:14-09:28.) The search of Donaldson's residence uncovered 736.5 grams of cocaine, 124.9 grams of crack, 221.9 grams of marijuana, over $57,000.00 in cash, a .40 caliber handgun, and a Rolex watch. (Doc. no. 101, p. 4.)

---

[3]Deputy Reynolds testified that she had worked with her canine partner "Spirit" for three years and that they were certified as a team with the United States Police Canine Association. (FTR 11:38:15-38:48.)

[4]No drugs were found during the vehicle search. Of note, however, Deputy Reynolds testified that it is not unusual for a canine to give a positive alert for the odor of narcotics based on "transfer odor," which occurs when the odor of a narcotic lingers on money or some other material that has been in contact with or stored in close proximity to the narcotic. (FTR 11:41:05-42:05.)

## II.    DISCUSSION

### A.    Stop and Search of Donaldson's Vehicle

Donaldson contends that "[a]t the time of the stop, the officers did not have any probable cause to believe that Donaldson was in possession of contraband." (Doc. no. 90, p. 3.) According to Donaldson, the officers had no adequate basis for concluding that the intercepted calls between him and "Big" involved "anything but innocent discussion." (Id.) Donaldson further argues that the officers had no reasonable basis for suspecting that his vehicle would contain contraband at the time it was searched, as they believed he was on his way to buy rather than sell narcotics. (See id. at 4.)  The government contends that the officers reasonably suspected that Donaldson was engaged in criminal activity at the time of the initial stop and that, based on the subsequent canine alert, they had probable cause to search his vehicle. (See doc. no. 101, pp. 5-7.)  The government has the better argument.

### 1.    The Initial Stop Was Supported by Reasonable Suspicion of Criminal Activity

Where a party moves for the suppression of evidence, the movant bears the initial burden of showing that he was subjected to a search or seizure and that the evidence in question should be suppressed; in the context of a warrantless search or seizure, the burden then shifts to the government to show that the encounter was consensual or that the search or seizure was justified.  See United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977)[5]; United States v. Beckham, 505 F.2d 1316, 1318 (5th Cir. 1975).

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

12

The reasonableness of an investigative stop turns on two inquiries: (1) whether the stop was reasonable at its inception, and (2) whether the stop became unreasonable in its scope or duration. See United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004); see also United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). Under Terry v. Ohio, 392 U.S. 1, 30 (1968), the police may briefly stop and detain persons in order to investigate a reasonable suspicion that those persons are involved in criminal activity, even in the absence of probable cause to believe that a crime has been committed. United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990). Reasonable suspicion is determined from the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop. Terry, 392 U.S. at 21; see also United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999).

Although the "reasonable suspicion" required for a Terry stop is less stringent than the requirement for probable cause, United States v. Mikell, 102 F.3d 470, 475 (11th Cir. 1996), "reasonable suspicion" requires that an officer have more than a "hunch" that criminal conduct is afoot based on unparticularized facts. The officer must be able to articulate some minimal, objective justification for the investigatory detention. Acosta, 363 F.3d at 1145; United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989). Moreover, reasonable suspicion for a stop can be based on the "collective" knowledge of all the officers involved in the stop. Acosta, 363 F.3d at 1145, and officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"

13

United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

Here, the government has shown reasonable suspicion of criminal activity based on the collective knowledge of the officers involved, including Investigator Hester. During the months preceding the stop, the investigating officers with the Richmond County Sheriff's Office, including Investigator Hester, intercepted a number of phone calls between Donaldson and Williams. Investigator Hester provided credible testimony that during these calls they employed coded slang terminology, such as "29 cent," to discuss drug activity and to make arrangements for drug transactions. (FTR 10:48:27-55:05.)

The investigating officers verified their understanding of these conversations with surveillance of Donaldson. For example, on June 26, 2011, Investigator Hester and another officer observed a transaction in which Donaldson and Williams met at a location used exclusively by Williams for conducting drug business; that transaction lasted only a few minutes, during which time Williams entered a house used to store drugs and drug money, following which he exited the house and handed a bag to Donaldson, who promptly drove away. (FTR 10:56:30-58:01.) In short, by the time of the stop at issue, Investigator Hester and the other investigating officers reasonably suspected that Donaldson was a drug dealer who conducted drug business with Williams.

In addition, the officers had reasonable suspicion that Donaldson was engaged in criminal activity at the time of the stop on July 1, 2011. During the days leading up to the stop, the officers intercepted several calls between Donaldson and "Big." These calls culminated with a series of recorded conversations on the morning of July 1st in which

14

Donaldson indicated that he was on his way to meet Big to buy cocaine. (FTR 10:58:01-11:00:54.) The Court rejects Donaldson's contention that there was no basis to conclude that these calls pertained to illegal drug activity. Investigator Hester testified that, based his training, experience, and knowledge of the investigation, he concluded that the use of terms such as "counts," "tires," and "channel" referred to drug activity. (See doc. no. 101, p. 3; FTR 10:59:05-59:20.) The fact that these terms are not susceptible to any sensible interpretation in ordinary discourse bolsters the conclusion that the terms are coded references to narcotics activity and belies Donaldson's contention that the conversations were innocuous.

Equally unavailing is Donaldson's argument that the officers lacked authority to stop him because they did not have "probable cause" to believe that he possessed narcotics at the time of the stop. As noted above, the test for determining the legality of an initial stop does not involve probable cause, but rather focuses on whether the government can satisfy the lower threshold of demonstrating that the officers had reasonable suspicion that the person stopped was involved in criminal activity. See Sokolow, 490 U.S. at 8; Acosta, 363 F.3d at 1144-45. Here, the previously discussed evidence that Donaldson was a drug dealer who was on his way to conduct a drug transaction provided the officers with reasonable suspicion that he was involved in criminal activity.

In sum, the government has shown that the officers involved in the July 1st stop reasonably suspected Donaldson of criminal activity such that the stop provides no basis for

the suppression of evidence sought in the instant motion.[6]

### 2. The Search of Donaldson's Vehicle Was Supported by Probable Cause

Donaldson's contention that the search of his vehicle warrants suppression is likewise without merit. In general, the police may search an automobile without a warrant under three circumstances: (1) incident to the lawful arrest of an occupant of the vehicle, see Arizona v. Gant, 556 U.S. 332, 351 (2009),[7] (2) based upon probable cause if the vehicle is readily mobile, see Pennsylvania v. Labron, 518 U.S. 938, 940-41 (1996) (*per curiam*), or (3) with valid consent, see Ohio v. Robinette, 519 U.S. 33, 39-40 (1996). In this instance, there was no warrant to search Donaldson's vehicle, and the record does not reflect that Donaldson consented to the search. However, a trained canine's alert on a vehicle, during a lawful stop which has not been unconstitutionally prolonged, constitutes probable cause to search a car for contraband. See United States v. Tamari, 454 F.3d 1259, 1265 (11th Cir. 2006) ("We have long recognized that 'probable cause arises when a drug-trained canine alerts to drugs.'" (quoting United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993))); Illinois v. Caballes, 543

---

[6]Of note, Donaldson does not contend, and there is nothing to suggest, that the scope or duration of the extremely brief stop at issue here rendered it unreasonable. Cf. United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000) (approximately 75 minutes of detention in handcuffs was not unreasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (stop of approximately 50 minutes awaiting the arrival of a canine unit was not unreasonable).

[7]Of course, it should also be noted that once officers have conducted a lawful arrest of the occupant-owner of the vehicle, they may also lawfully impound the car and conduct an inventory search. See Arkansas v. Sullivan, 532 U.S. 769, 770 (2001) (*per curiam*); Colorado v. Bertine, 479 U.S. 367, 368-69 (1987) (upholding inventory search of van after driver's arrest for drunk driving).

U.S. 405, 406-09 (2005).[8]

Here, a certified canine unit arrived at the scene immediately after the initial stop; the canine conducted a open air sniff around the vehicle and signaled the presence of an odor of narcotics. Therefore, at that point, the officers had probable cause to search the vehicle. Indeed, the alert confirmed to the officers that narcotics or a material carrying the odor of narcotics were inside, or had recently been inside, the vehicle. Once probable cause was established, there is no question that the ensuing search of the vehicle was justified.[9]

In sum, the government has shown the necessary justification for both the initial stop and the subsequent search of Donaldson's vehicle. The Court therefore finds no basis to suppress any evidence because of the stop and search.

### B. Search of Donaldson's Residence

Donaldson additionally seeks suppression of the evidence seized as a result of the search of his house, which also occurred on July 1, 2011, shortly after the initiation of the traffic stop. In particular, Donaldson argues that the search warrant and accompanying affidavit "did not provide probable cause that evidence of a crime would be found [at Donaldson's residence]." (Doc. no. 90, pp. 4-8.) Donaldson also asserts that the search warrant affidavit contains false information and that the good faith exception to the exclusionary rule does not apply because "the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."

---

[8]The sniff itself "is not a search implicating Fourth Amendment concerns." Tamari, 454 F.3d at 1265 n.6.

[9]There is no dispute that the vehicle was readily mobile.

17

(Id. at 11 (quoting United States v. Leon, 468 U.S. 897, 923 (1984).)

In response, the government asserts that the information provided by Detective Turner – including the search warrant affidavit and oral testimony – demonstrated probable cause to believe that contraband or evidence of criminal activity would be found at Donaldson's residence. (Doc. no. 101, pp. 7-11.) In addition, the government disputes Donaldson's claim that the search warrant affidavit contained false information, and it argues that the Leon good faith exception applies in this case because "though the affidavit leaves much to be desired, it is not completely devoid of an [sic] *indicia of probable cause*." (Doc. no. 101, p. 17.)

For the reasons set forth below, the Court again finds that the government has the better argument.

### 1.    Credibility Determination as to Information Presented in Applying for the Search Warrant

Because of the factual conflicts regarding what information was provided by Detective Turner to Judge Edmonds in applying for the warrant to search Donaldson's residence, the Court must first address the threshold issue of credibility. Credibility determinations "are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002); see also United States v. Pineiro, 389 F.3d 1359, 1366 (11th Cir. 2004) (recognizing that credibility determinations are within the province of the factfinder). In making its credibility determination, the Court must take into consideration not only the interests of the

18

witness, but also "the internal consistency of the [witness's] testimony, or his candor or demeanor on the stand." Ramirez-Chilel, 289 F.3d at 749, 750 (citations omitted).

Here, the Court credits Detective Turner's testimony that, in addition to the warrant and accompanying affidavit, he gave sworn, unrecorded testimony in which he provided Judge Edmonds with the information set forth in the written summary that had been given to him by the Richmond County officers involved in the investigation. During his live testimony, Detective Turner provided a detailed, first-hand account of the warrant application process. Moreover, he was unequivocal in stating that he had provided sworn, oral testimony in addition to the written material, and he explained his reasons for providing sensitive investigatory details orally rather than setting them forth in writing in the affidavit. (FTR 11:51:08-12:01:41.)

The Court also credits Judge Edmonds' testimony that he was familiar with the factual content of the written summary, as well as his testimony that he often took oral testimony in support of warrant applications. Although Judge Edmonds had difficulty recalling the details of the warrant application process at issue here, he was unequivocal in attesting that he recalled the facts set forth in the written summary; he also testified that it was not unusual for him to take sworn, oral testimony from officers applying for search warrants, which further supports Detective Turner's account. (FTR 1:24:18-35:24.)

The Court acknowledges that Judge Lynn provided testimony suggesting that Judge Edmonds had stated in a subsequent conversation that he signed the warrant without any information aside from that set forth in the warrant and accompanying affidavit. (FTR 1:39:00-40:01.) However, Judge Lynn had no first-hand knowledge of the warrant

19

application, and Judge Edmonds specifically denied having told Judge Lynn that he signed the warrant without taking oral testimony. (FTR 1:36:56-37:44.) Therefore, the Court credits the testimony of Detective Turner and Judge Edmonds, and it finds that when Detective Turner applied for the warrant to search Donaldson's residence, he gave sworn, oral testimony providing Judge Edmonds with the information set forth in the written summary of the Richmond County officers' investigation. (See Gov't Ex. 2.)

## 2. Probable Cause Properly Established

Having made the factual determination regarding what information was presented in support of the warrant application, the Court turns to the issue of whether there was probable cause for the search warrant. Whenever a search warrant application is presented to a judicial officer, the judicial officer must

> make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983); see also United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (per curiam) ("Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." (citation omitted)). "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002). The Court is mindful, however, that "probable cause deals 'with probabilities. These are not technical; they are the factual and

practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting Gates, 462 U.S. at 241). Moreover, these probabilities need not come from direct observation but may be inferred from the particular circumstances at issue.[10] United States v. Jenkins, 901 F.2d 1075, 1080 (11th Cir. 1990). "[P]robable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts. . . ." Gates, 462 U.S. at 232.

Also, sufficient information must be presented to the judicial officer to allow for the exercise of independent judgment; the judicial officer cannot simply ratify the conclusions of others. Gates, 462 U.S. at 239. However, common sense must be employed when reading the affidavit, United States v. Ventresca, 380 U.S.102, 108 (1965), and the Court is guided by the principle that the affidavit supporting a search warrant is presumed valid. Franks v. Delaware, 438 U.S. 154, 171 (1978). A court reviewing the decision of a judicial officer concerning the existence of probable cause gives "great deference" to that determination. United States v. Leon, 468 U.S. 897, 914 (1984); United States v. Gonzalez, 940 F.2d 1413, 1419 (11th Cir. 1991). Thus, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Cauchon v. United States, 824 F.2d 908, 911-12 (11th Cir. 1987) (citing Gates, 462 U.S. at 238-39).

Furthermore, of particular relevance to this case, "[t]he Fourth Amendment does not

---

[10]Notably, probable cause may be based on evidence that would not be legally competent in a criminal trial. Draper v. United States, 358 U.S. 307, 311-12 (1959).

require that the basis for probable cause be established in a written affidavit; it merely requires that the information provided the issuing magistrate be supported by 'Oath or affirmation.'" United States v. Clyburn, 24 F.3d 613, 617 (4th Cir. 1994) (quoting U.S. Const. amend. IV). The Fourth Amendment likewise sets forth no requirement "that statements made under oath in support of probable cause be tape-recorded or otherwise placed on the record or made part of the affidavit."[11] Id. (quoting United States v. Shields, 978 F.2d 943, 946 (6th Cir. 1992)). Therefore, "a federal court . . . may consider an affiant's oral testimony, extrinsic to the written affidavit, which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause." United States v. Hill, 500 F.2d 315, 320 (5th Cir. 1974)[12]; accord Clyburn, 24 F.3d at 617 ("[M]agistrates may consider sworn, unrecorded oral testimony in making probable cause determinations during warrant proceedings."); Frazier v. Roberts, 441 F.2d 1224, 1226 (8th Cir. 1971) ("It is clear that the Fourth Amendment permits the warrant-issuing magistrate to consider sworn oral testimony supplementing a duly executed affidavit to determine whether there is probable cause upon which to issue a search warrant.").

---

[11]The Court's recognition that unrecorded testimony may properly factor into the Fourth Amendment inquiry required here should not be read as an endorsement of the practice of using such testimony. As noted by the Clyburn court, obvious reasons counsel in favor of recording any testimony taken in conjunction with a warrant application, such as the fact that recorded testimony provides a more reliable, permanent record than unrecorded testimony. Clyburn, 24 F.3d at 618. However, the Court's analysis must be guided by the requirements of the Fourth Amendment, not any preferences as to the best procedure for conducting warrant applications.

[12]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Here, upon examination of the totality of the circumstances, as well as the written affidavit and oral testimony provided by Detective Turner, the Court concludes that Judge Edmonds had a substantial basis for concluding that probable cause existed to issue the search warrant. In his sworn, oral testimony to Judge Edmonds, Detective Turner related the information set forth in the written summary he had been provided by Richmond County officers, which included descriptions of intercepted calls between Williams and Donaldson pertaining to cocaine transactions. Regarding a call intercepted on June 26, 2011, Detective Turner stated that Williams and Donaldson agreed to meet at Williams' Camille Street "trap house." Detective Turner further stated that on the same day, officers observed a transaction during which Williams entered one of the Camille Street houses and exited soon thereafter with a white bag, which he gave to Donaldson. Detective Turner also described intercepted phone conversations between Donaldson and "Big" (referred to as "U/M" in the summary) that occurred on June 27, 2011. During the June 27th conversations, Donaldson told Big that he "might be alright" for the time being, which Detective Turner, based on his knowledge and experience, interpreted as a statement by Donaldson meant to convey that he likely had sufficient cocaine for the time being. Donaldson and Big further discussed their plans for an upcoming cocaine transaction, using coded language such as "counts" and "tires." In addition, Detective Turner testified that the investigating officers had determined that Donaldson resided at 180 Oakland Drive, North Augusta, based on tracking his cell phone, observing him at the residence, and confirming that a vehicle at the residence was registered in his name. (FTR 11:51:54-12:00:00; Gov't Ex. 2.)

Detective Turner also submitted a written search warrant affidavit, which provided,

23

"Through the use of multiple investigative means and techniques it has been established that within the past seventy-two hours, Donaldson was in possession of a quantity of Cocaine and was in the process of acquiring more Cocaine." The affidavit also provided Donaldson was living at the residence to be searched, in support of which it stated that Donaldson had been present at the residence for extended periods of time and that the utility account with the City of North Augusta Water was in Donaldson's name. (Gov't Ex. 1.)

Furthermore, it is well established that, in combination with other factors, warrant-issuing magistrates may consider an officer's experience, knowledge, and expertise in making probable cause determinations. See United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) ("[O]pinions and conclusions of an experienced agent regarding a set of facts are properly a factor in the probable cause equation [for issuing a search warrant]." (quoting United States v. Motz, 936 F.2d 1021, 1024 (9th Cir.1991))); United States v. Jenkins, 901 F.2d 1075, 1081 (11th Cir. 1990) (confirming appropriateness of officer applying for warrant relying on conversation with 17-year veteran FBI agent who had worked for 10 years on bank robbery and burglary matters to support finding of probable cause in warrant affidavit that fruits of theft likely to be found in residence to be searched); see also United States v. Villegas-Tello, 319 F. App'x 871, 875 (11th Cir. 2009) (*per curiam*) (holding that, in conducting a probable cause analysis, courts may consider officers' experience, "as 'conduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer'" (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir. 1992))).

As noted previously, in his affidavit, Detective Turner attested that he had several

24

years of experience as a narcotics detective, had investigated hundreds of drug cases, had received extensive specialized narcotics training, and had been certified as an expert in the field of narcotics investigation within the second judicial circuit of South Carolina. (See Gov't Ex. 1.) Thus, the development of probable cause in this case was also supported by the information in Detective Turner's affidavit that, in light of the information he had regarding the investigation of Donaldson, he formed a belief based on his training and experience that Donaldson would be in possession of narcotics or related materials and that such items would be located at Donaldson's residence at 180 Oakland Drive.[13] (See id.)

Donaldson's arguments against finding probable cause for the search warrant are unpersuasive. For example, the Court rejects Donaldson's contention that Detective Turner provided false information by stating in the affidavit that Donaldson had possessed cocaine and was in the process of acquiring more within the past 72 hours. Detective Turner applied for the warrant on June 28, 2011, and within the past 72 hours, officers had observed Donaldson conduct a transaction with Williams at Williams' Camille Street houses, which were used exclusively for Williams' narcotics operation. The June 27th call in which Williams indicated to Big that he had sufficient cocaine for the time being and made plans to acquire more cocaine in the near future also occurred within the 72-hour period preceding

---

[13]As noted previously, in his affidavit, Detective Turner attested that he had several years of experience as a narcotics detective, had investigated hundreds of drug cases, had received significant specialized narcotics-related training, and had been certified as an expert in the field of narcotics investigation within his second judicial circuit of South Carolina. (See Gov't Ex. 1.)

the warrant application. Thus, the statement in the affidavit that Donaldson had possessed cocaine and was in the process of acquiring more within the past 72 hours was not false.

Also, contrary to the argument advanced by Donaldson, the Court finds that the information provided to Judge Edmonds established a sufficient connection between Donaldson, his criminal activity, and the residence to be searched. "Information that the defendant possesses contraband that is of the type that normally would be hidden at his residence may support a probable cause finding." United States v. Meryl, 322 F. App'x 871, 874 (11th Cir. 2009) (per curiam) (citing Jenkins, 901 F.2d at 1080-81). Moreover, "[t]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." Jenkins, 901 F.2d at 1080 (quoting United States v. Lockett, 674 F.2d 843, 846 (11th Cir. Ala. 1982)). In addition, special considerations come into play when the place to be searched is a suspect's primary residence:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime.

United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981).

Here, as noted previously, Detective Turner provided information that Donaldson had recently conducted a transaction with Williams at the Camille Street houses, which were used solely for drug-related business; Detective Turner also informed Judge Edmonds of the intercepted June 27th call in which Donaldson indicated to Big that he had cocaine and

planned to purchase more cocaine. Detective Turner additionally provided information showing that Donaldson resided at the 180 Oakland Drive house and that, based on surveillance and cell phone "ping" records, Donaldson was frequently present at his residence during the relevant time frame. In light of these facts, it is evident that the information provided to Judge Edmonds by Detective Turner sufficiently demonstrated a connection between Donaldson, his residence, and criminal activity.

In sum, based on the affidavit and oral testimony provided by Detective Turner, the Court concludes that probable cause existed to support the issuance of the search warrant by Judge Edmonds. As a result, Donaldson is not entitled to suppression of the evidence seized during the search of his residence carried out pursuant to that warrant.

### 3. Good Faith Exception

Even if the Court had determined that probable cause to support the issuance of the warrant had not been established, the evidence discovered as a result of the execution of the contested search warrant would be admissible under the "good-faith" exception to the exclusionary rule set forth in United States v. Leon, 468 U.S. 897 (1984).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. amend. IV, and the judicially created remedy known as the exclusionary rule acts as a deterrent to violating the Fourth Amendment by preventing the use of evidence seized as a result of an illegal search. United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, under Leon, the good-faith exception allows the introduction of evidence in the prosecution's case in chief that is "seized by officers reasonably relying on a warrant issued

27

by a detached and neutral magistrate." Leon, 468 U.S. at 913. The Leon Court explained that the good-faith exception to the exclusionary rule was appropriate because "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." Id. at 916. Thus, under Leon, the question becomes whether the officers executing the warrant reasonably relied on Magistrate Judge Edmonds' determination of probable cause. See id. at 913; see also United States v. Herring, 492 F.3d 1212, 1215 (11th Cir. 2007) ("[T]he exclusionary rule does not bar the use of evidence obtained by officers acting in good faith reliance on a warrant.").

Under Leon, there are four scenarios under which the good-faith exception to the exclusionary rule would not apply. The exception does not apply where the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Leon, 468 U.S. at 923. Nor does the exception apply in cases where the issuing judge "wholly abandoned" his or her detached and neutral judicial role such that no reasonably well trained officer would rely on the warrant. Id. The warrant must not be based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and the warrant must not be so "facially deficient" that the executing officers could not reasonably presume it was valid. Id. Notably, however, in determining whether there are sufficient indica of probable cause, the Court may "look beyond the four corners of the affidavit and search warrant" and "may consider information known to [the officers executing the warrant] that was not presented in the initial search warrant application or affidavit." Martin, 297 F.3d at 1318.

Here, there is no suggestion or evidence that Judge Edmonds "wholly abandoned" his detached and neutral role in issuing the warrant, or that the warrant was in any way "facially deficient" such that the executing officers could not reasonably presume its validity. The Court has already rejected Donaldson's contention that Detective Turner provided false information in the search warrant affidavit. See supra Part II.B.2. Thus, unless the warrant was so lacking in indicia of probable cause so as to render belief in its existence entirely unreasonable, the good faith exception could be applied in this case. See Leon, 468 U.S. at 923. Because Detective Turner was one of the officers who executed the search warrant (see doc. no. 90, Ex. C), facts within his knowledge that are not set forth in the warrant or affidavit properly factor into the Court's determination of whether there were sufficient indicia of probable cause. Martin, 297 F.3d at 1318. As set forth above, there were multiple facts that were either set forth in the affidavit or known by Detective Turner that supported a finding of probable cause, including the intercepted phone calls and surveillance involving Donaldson. See supra Part II.B.2 Accordingly, it was not unreasonable to believe that probable cause existed.

In sum, the Court concludes that even if probable cause to support the issuance of the warrant had not been established, a position discredited above, see id., the evidence discovered as a result of the execution of the contested search warrant would be admissible under the good-faith exception to the exclusionary rule set forth in Leon.

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that

Donaldson's motion to suppress be **DENIED**.  (Doc. no. 90.)

SO REPORTED and RECOMMENDED on this 23rd day of February, 2012, at

Augusta, Georgia.

W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE